LittletoN, Judge,
delivered the opinion of the court:
This is a suit by plaintiffs as the owners of a trade school operated in New York City to recover tuition for instruction furnished veterans pursuant to a series of contracts with the-Veterans Administration.[1] Under these contracts plaintiffs5' school furnished education and training to eligible veterans, under the Servicemen’s Readjustment Act of 1944, 58 Stat. 287, 38 U. S. C. Chap. 12A, Veterans Regulation 1 (a), Part VIII, (Public Law 346), and provided vocational rehabilita *342 tion of disabled veterans under the Act of March 24, 1943, 57 Stat. 43, 38 U. S. C. Chap. 12A, Veterans Regulation 1 (a), Part VII, (Public Law 16). Payment in full under these contracts has been withheld by defendant on the ground that plaintiffs had made false representations in supplying data relative to their cost of operations which data, according to regulation, had been filed with the Veterans Administration and used as a basis for the determination of the tuition rates in the contracts. Defendant has filed a counterclaim for the resultant overpayments.
Effective July 1,1948, the Veterans Administration issued a regulation which became known as Change 4 to VA Manual 7-5,13 F. R. 2695,38 CFR 21.530 (1949 Ed.). It required, with respect to schools like plaintiffs which came into existence after June 22,1944, had a majority of veterans, and were operated for profit, that thereafter tuition rates would be determined on a fair and reasonable basis predicated upon detailed financial statements or cost data to be submitted by the schools. This regulation was issued by the Veterans’ Administrator pursuant to his regulatory authority and interpreted the sections of the statutes providing that he “shall pay to the educational or training institution * * * the customary cost of tuition * * as those sections apply to schools like plaintiffs’. Plaintiffs do not question its application here, and its validity has been upheld by the courts. Metropolitan Training Center v. Gray, 88 U. S. App. D. C. 172, 188 F. 2d 28; Feener Technical Schools, Inc. v. United States, 136 C. Cls. 94. See also Carroll Vocational Institute et al. v. United States, 5th Cir., 211 F. 2d 539. The pertinent provisions of this regulation are set forth in finding 6. In order to implement this new regulation the Veterans Administration issued a set of instructions which explained the purposes of the regulation and the method of setting out the financial data which was to be supplied. Attached to these instructions were forms for the schedules of costs to be submitted. Copies of the instructions and forms were mailed to plaintiffs as well as to all like schools in the New York area.
Plaintiffs’ school had been training veterans under contracts with' the Veterans Administration since July 1, 1947, and upon the expiration of the school’s contract ending July *343 31, 1948, they submitted to the Veterans Administration, in compliance with the new regulation and on the forms provided, the required cost data. The statements were certified by plaintiffs as true and in accordance with the books and records of the institution, and purported to set out the school’s cost of operations for the period July 1, 1947, to May 31,1948. The summary sheets covering the two courses, auto body repair and furniture upholstery, offered by plaintiffs, are set forth in finding 9. Certain adjustments were made by the Veterans Administration with respect to some of the cost items, and the costs as adjusted and utilized in setting the tuition rates in plaintiffs’ contracts are set out in finding 11. These adjusted costs for each course were divided by the student hours of instruction as reported by the school giving an hourly tuition rate of $.648 for the auto body course and $.769 for the furniture upholstery course. These tuition rates were offered to the school and accepted, and were embodied in plaintiffs’ contracts covering the period August 1,1948, to July 31,1949.
On August 24, 1949, Congress enacted a statute, 63 Stat. 657, which provided that where one or more contracts providing a rate or rates of tuition had been executed for two successive years, the rate established by the most recent contract should be considered to be the customary cost of tuition. This statute effected a “freezing” of the above rates and eliminated the need for the submission of any further cost data. Payments to plaintiffs’ school at the above rates continued under successive contracts until August 1,1951, when payments were interrupted as a result of an audit of the school’s records by the General Accounting Office.
During 1950 and 1951 the General Accounting Office undertook a survey of the education program for veterans as administered by the Veterans Administration in the New York area. Plaintiffs’ school was selected at random as a representative school for audit. This audit revealed that the enrollment figures, submitted by the school in its cost data for the period of July 1, 1947, to May 31, 1948, and used as a divisor for the determination of the tuition rates, were inaccurate. It was found that the student hours of attendance for that period in the auto body course were *344 277,664 rather than 199,261 hours as reported by the school,, and the student hours of attendance for the furniture upholstery course were 119,228 hours rather than 61,445 as. reported by the school. This discrepancy is explained by the fact that the school took its hours of student attendance-from those vouchers of the school which had, at the time of' the submission of the cost data, been paid by the Veterana Administration. It did not include hours taught for which no billing had yet been made or for which payment had not yet been received from the Veterans Administration. It is,, of course, quite apparent that the reporting of all of the schools expenses and only a fraction of the student hours, of instruction, as represented by the paid vouchers, would serve to distort the cost experience of the school.
The cost statements submitted by the school had been prepared by Henry J. Reicher, a certified public accountants Reicher, as a trustee of the Baird Fund which operated the school during part of the period involved here, appears as a co-plaintiff in this suit. He testified that although he obtained various items of cost from the books of the school,, he took the figures for the student hours of attendance from the vouchers of the school which had been paid by the Veterans Administration. He further stated that although he-knew that the method to be used in determining the tuition rate per hour was to divide the school’s costs by the number-of instruction hours, he used the figures from the paid vouchers because the schedule 11A provided on the Veterans-Administration cost data forms on which the student hours were to be listed was subheaded “Paid Student Hours of Attendance.” Despite such a heading, however, this schedule, as well as schedule 11 calling for the listing of hours of instruction, total the figures as “Student Hours of Instructions.” Finding 10. The purpose of the language in the heading was to call the attention of the schools to the fact that to be included in the hours of attendance for which they were entitled to be paid, were permissible absences not to exceed 5 percent of the total number of hours of instruction. Thus, they were entitled to include in their tabulation of hours of instruction to be paid, hours during which a student may have actually been absent provided *345 the individual student’s total absences did not exceed 5 percent of his total hours.
Apart from the fact that to a certified public accountant the computing of the costs by such a method, i. e., reporting all the expenses but only a fraction of the student hours, should have been notice in itself that a distorted result would be provided, the instructions which accompanied the forms dispelled any doubt. With respect to the pertinent schedules, the instructions read:
An enrollment figure arrived at by dividing the gross income for the period covered by the cost statement by the tuition per student is not acceptable. Enrollment must be aclMal enrollment figures of student attendance and student hours taken from the attendance records of the institution, [italics in the original]
Mr. Reicher stated that he did not have the instructions, merely the forms, despite the fact that the instructions and forms were always treated as a single unit, and the further fact that it was difficult if not impossible to properly complete the forms in other respects without making use of the instructions. There is also the testimony of a Veterans Adi ministration official that the instructions were utilized in discussions he had with Mr. Reicher with respect to the tuition rates. In the subsequent audit made by the General Accounting Office of over 100 trade schools in the New York area, only plaintiffs’ school was found to have submitted its hours of attendance on the basis of paid vouchers rather than on the basis of total student attendance.
Defendant alleges that the method employed by plaintiffs in submitting their student hours of attendance was a misrepresentation of the school’s cost of operations which resulted in the establishment of tuition rates in the subject contracts that were far and away greater than the fair and reasonable compensation contemplated by the regulation and allowed under the statutes.
Plaintiffs position is that although they have not questioned the reasonableness and fairness of the rates as recomputed, they seek recovery on the basis of the original rates on the grounds that those rates were established by the Veterans Administration following an audit of plaintiff’s *346 records and that any mistake made in the setting of the rates was that of the Veterans Administration. Thus, plaintiffs allege, the mistake, if any, was a unilateral one and therefore not grounds upon which a performed contract can be reformed or avoided.
The audit to which plaintiffs have reference was not an audit as that term is usually understood. What occurred was that following receipt of plaintiffs’ cost statement, a field agent of the Veterans Administration visited plaintiffs’ school and conducted what amounted to a spot check to verify certain items, including attendance figures, contained in the school’s cost statement. It was a procedure utilized in all cases by the Veterans Administration. It was not contemplated that the investigation by the field agent was to be as detailed as that generally undertaken when an actual audit is made. When an audit of plaintiffs’ records was subsequently made, the discrepancy with respect to the hours of instruction was discovered.
The shortest answer to plaintiffs’ position is, of course, that to adhere to it would place a premium on attempts to pad cost figures. If discovered prior to execution of the contract, it can be explained away as a misunderstanding and corrected. If not discovered until later, as here, then the mistake is to be treated as being that of the party to whom the incorrect data had been supplied on the theory, as advanced by plaintiffs, that that party, having undertaken to spot check the data, and having not discovered the discrepancy, is now burdened with the mistake.
With respect to the law, the contracts which the Veterans Administration is authorized to enter into for the education and training of veterans are those and only those permitted under the applicable statutes and regulations. Here it is the provisions of the regulation which govern, and the rates to be paid under it were to be fair and reasonable. The rates under the subject contracts resulting as they did from the plaintiffs’ submission of incorrect figures, certainly have not met that test.
In 1951 plaintiffs added courses in welding and slip cover and drapery work which the Veterans Administration treated as similar to the courses already offered and they *347 applied the same rates as allowed on the others. While plaintiffs contest this action in treating these new courses as similar to the others, they have offered no evidence which would warrant our disturbing the Veterans Administration determination.
As a result of the General Accounting Office audit the rates as recomputed were $.467 for the auto body repair course and $.542 for the furniture upholstery course. While certain other adjustments were also made with respect to other items involved, they have not been put in issue here.
Plaintiffs are not entitled to recover and their petition will be dismissed.
Under the redetermined rates, the resulting overpayment of tuition to the school is $681,815.80, and defendant is entitled to recover that amount on its counterclaim. Unpaid vouchers in the net amount of $609,921.17 have already been withheld by defendant, and plaintiffs are entitled to an offset in that amount. Judgment therefore will be entered for defendant on its counterclaim against plaintiffs in the sum of $71,894.63.
It is so ordered.
Faht, Oirmit Judge, sitting by designation; MaddeN, Judge; Whitakeb, Judge; and JoNes, OMef Judge, concur.
BINDINGS OE EACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiffs, a partnership consisting of Edith Eoberts, Louis Eoberts and Eichard Eoberts, conduct their business as Eoberts’ Technical and Trade Schools, with principal office and place of business at 343 East 63rd Street, New York, N. Y.
2. Plaintiffs operate a vocational training school which was originally established in 1947 as a corporation for profit under the laws of the State of New York and was then known as Eoberts’ Technical Trade School Inc. On or about October 20, 1948, all of the stock of said corporation, which was then solely owned by Edith Eoberts and Louis Eoberts, *348 was sold to the Baird Fund, an unincorporated charitable trust. The plaintiff corporation was operated by said Fund until December 31,1948, at which time the corporation was liquidated and the school was operated by the Baird Fund, •d. b. a. Technical and Trade Schools, until June 30, 1951. On or about June 30, 1951, the institution was sold to the plaintiffs, Edith Eoberts and Louis Eoberts, who operated the institution as a partnership under the name of Eoberts’ Technical Trade Schools. The partnership was expanded to include Eichard Eoberts on or about November 1,1951.
3. For all periods pertinent to this action, the school operated by plaintiffs was licensed and approved by the Education Department of the State of New York to furnish education and training to eligible veterans under the Servicemen’s Eeadjustment Act of 1944 (Public Law 346,78th Congress, 38 USC Chap 12A, Veterans Eegulation No. la, Part VIII) and to provide for vocational rehabilitation of disabled veterans under Public Law 16,78th Congress, enacted March .24, 1943 (38 USC Chap 12A, Veterans Eegulation la, Part VII).
4. Plaintiffs had a series of written contracts with the Veterans Administration dated and numbered as follows:
(a) Contract VA6rvr537, as supplemented, covering the period from July 1,1947, through December 31,1947, providing for vocational rehabilitation of Public Law 16 veteran ■trainees and establishing a rate of tuition for a course in auto body repair and refinishing in the amount of $.64 per ■student per hour, and a rate for a course in furniture upholstery in the amount of $.73 per student per hour. By agreement of the parties this contract was renewed and extended without change to July 31,1948.
(b) Contract VA6rve266, as supplemented, covering the period from July 1, 1947, through December 31, 1947, providing for education and training of Public Law 346 veteran trainees and establishing a rate for a course in auto body repair and refinishing in the amount of $.64 per student per hour, and a rate for a course in furniture upholstery in the amount of $.73 per student per hour. This •contract was also renewed and extended without change to July 31,1948.
*349 (c) Contract V3006V114, as supplemented, covering the period from August 1,1948, .through July 31,1949, providing for education and training of Public Law 346 veteran trainees and establishing a rate of $.64 per student per hour for a course in auto body repair and refinishing, and a rate of $.7694 per hour for a course in furniture upholstery.
(d) Contract V3006V139, as supplemented, covering the period from August 1,1948, through July 31,1949, providing for vocational rehabilitation of Public Law 16 veteran trainees and establishing a rate of $.64 per student per hour for a course in auto body repair and refinishing, and a rate of $.7694 per student per hour for a course in furniture upholstery.
(e) Contract V3006V522, covering the period from August 1, 1949, to July 31, 1950, and contract Y3006Y847, covering the period from August 1,1950, to July 31, 1951, providing for education and training of Public Law 346 trainees and for vocational rehabilitation of Public Law 16 veteran trainees, respectively, and renewing the same tuition rates established under prior contracts Y3006Y114 and Y3006Y139.
The series of contracts referred to above served as a basis for establishing plaintiff’s customary cost of tuition at the rates fixed in said contract Y3003V522', under the provisions of Public Law 266, 81st Congress (an item in the Independent Offices Appropriation Act for the fiscal year 1950, approved August 24,1949, 63 Stat. 631,655) and Public Law 610, 81st Congress (July 13, 1950, c. 461 Sections 2, 5, 64 Stat. 338).
5. Under the contracts involved here, plaintiffs were required to provide instruction, books, supplies and equipment for the courses designated therein at the charges agreed upon and indicated above to veteran trainees, approved by the Veterans Administration as entitled to education and training under Public Law 346 and vocational rehabilitation under Public Law 16, who, during the respective periods set forth in the said contracts were enrolled in and accepted for instruction in said courses. The Veterans Administration agreed to pay plaintiffs at the respective rates set forth in said agreements and plaintiffs furnished to eligible veteran *350 trainees the required instruction, books, supplies and equipment. Plaintiffs prepared, certified and presented vouchers to the Veterans Administration for services rendered under said contracts and payment of such vouchers was made by the Veterans Administration.
6. Effective July 1, 1948, the Veterans Administration issued Change 4 to VA Manual 7-5, (38 C. F. E. 21.530 (1949 Ed.)), the controlling agency regulations, which required that tuition rates would henceforth be determined on a fair and reasonable basis predicated upon detailed financial Statements, hereafter referred to as cost data, to be submitted by profit schools such as that operated by the plaintiffs. A copy of the Manual and Change 4 was mailed to the plaintiff school and the auditor for the plaintiff school was familar with the provisions of Change 4. Change 4 reads, in pertinent part, as follows:
§ 21.530. Determination of faw and reasonable compensation. The determination of fair and reasonable compensation by the manager, as in the case of courses of less than 30 weeks, or courses of 30 weeks or more in institutions other than non-profit, will require the submission by the educational or training institution of detailed, certified financial statements showing the most recent actual cost experience of the institution for the specific courses involved including cost data on the items of expense which will be used for the determination of fair and reasonable compensation, the basis on which teaching salaries and other expenses have been allocated to the courses involved, and the number of students enrolled and the number of clock hours or credit hours during the period covered by the cost data. In the case of new courses for which no actual cost experience is available, estimated costs may be submitted.
“(b) For institutions other than nonprofit for either ■courses of less than SO weeks or courses of SO weeks or more. Fair and reasonable compensation for schools operated for profit will not exceed the actual or estimated costs to the institution for providing the instruction, plus an allowance for profit as indicated below. In determining the fair and reasonable compensation all expenses, except expenses for sales commissions and promotional plans, which are reasonable and necessary for the operation of the courses involved will be included *351 in the cost statement and such expenses will be grouped into the general categories set forth below within the limits designated.
(1) Actual cost of teaching and related personnel at reasonable salaries. Teaching and related personnel will include personnel essential to the teaching function such as laboratory supply room attendants and clerical personnel assisting teachers in the preparation of instructional material and records. The salaries of personnel serving both in administrative and teaching functions will be prorated accordingly. The cost shown for teaching personnel will be supported by a schedule listing the name, title, annual salary rate, and will show whether employment is part or full time for each person included in such cost.
(2) Consumable instructional supplies.
(3) Depreciation on building and equipment actually used for instruction of students at rates allowed by the Bureau of Internal Revenue for income tax purposes.
(4) Reasonable rent.
(5) Cost of heat, light, power, water, janitor service, and building maintenance.
(6) Taxes and insurance, exclusive of income taxes.
(7) Actual administrative expenses which are considered reasonable and necessary in the operation of the school and are properly allocable to the courses under review. Such expenses may include salaries of administrative and clerical personnel representing reasonable compensation for services actually performed and the cost of such items as postage, telephone and telegraph, travel, interest, legal and accounting fees for actual services (not retainers), stationery and office supplies and such other similar expenses as are reasonable and necessary for the operation of the school: Provided, That in no case will there be included in the fair and reasonable cost determination a base salary in excess of the rate of $10,000 per annum for an individual who has a proprietary or bonus interest in the institution. The administrative cost must be itemized and the salary items must be supported by a statement showing for each person the name, title, annual salary, percentage of time devoted to administration and the amount of salary allocated to the cost of the courses under review. All cases where requested administrative costs exceed 15% of subparagraphs (1), (2), (5) and (6) of this paragraph shall be forwarded to Assistant Administrator for Vocational Rehabilitation and Education, Central Office for review and approval.
*352 (8) Advertising expense calculated in acordance with the procedure set forth below and not to exceed the limitations prescribed herein.
$ $ $ $
(9) Profit not to exceed 10% of the amount customarily charged to non-veteran students for the course.
* * * * #
(10) * * *
(c) When the manager has completed his analysis of the cost data. When the manager has completed his analysis of the cost data, he will determine on the basis of the total number of all students trained and cost of the items listed herein, after reflecting known changes in costs, whether the customary charges of the educational or training institution are fair and reasonable. In making this determination the manager will give consideration to the fact that it is not fair and reasonable for the Veterans’ Administration to pay a charge based on the full cost of operating an educational institution under abnormal situations, such as periods when enrollments in the institution are far below the normal capacity and expectancy of the institution, or where operating costs are greatly in excess of normal operating costs for other comparable institutions in the same general locality. Contracts, when required, will be negotiated to provide payment not to exceed the amounts determined by the manager to be fair and reasonable as provided herein.
*****
§21.510 * * *
*****
(2) (ii) (b) * * *
In the negotiation of contracts as required in (a) and (b) of this subdivision (ii), it will be necessary for the school to submit cost data. Agreed contract rates will not exceed rates determined by the Veterans’ Administration to be fair and reasonable in accordance with the provisions of § 21.580.”
7. In- order to implement the provisions of Change 4, the New York Eegional Office of the Veterans Administration issued a set of mimeographed instructions which explained the purpose of the Eegulation and the method of setting out the financial data upon which tuition rates were to be based. Attached to these instructions were forms for the schedules of costs to be submitted to the Eegional Office. Copies of the *353 instructions and attached forms were mailed to all trade schools in the jurisdiction of the New York Regional Office. A copy was mailed to the plaintiff on June 11, 1948. The instructions read in part as follows:
YeteraNS Administration
Vocational Rehabilitation and Education Division
Training Facilities Section
252 Seventh Avenue
New York 1, New York
explanation and instructions eor the preparation oe COST STATEMENTS REQUIRED OE INSTITUTIONS EOR THE DETERMINATION OE PAIR AND REASONABLE TUITION CHARGES UNDER PUBLIC LAW 346, 78TH CONGRESS, AS AMENDED
Reference is made in Public Law 346,78th Congress, as amended, to the term “fair and reasonable” with respect to the amount that may be paid to an institution for furnishing instruction to veterans entitled to educational benefits thereunder.
The purpose of this instruction is to set forth the formulae to be used in determining what is “fair and reasonable” compensation for such services furnished by educational institutions, and to explain in detail what financial statements must be submitted by the institutions in order that such a determination may be made.
It is important that the policies and procedures for making such determinations and the items to be submitted to the Veterans Administration be thoroughly understood and employed by all institutions in the preparation of their cost statements. The submission of insufficient or improper information may result in delays, duplication of work and unnecessary expense.
In general, the presentation and determination of “fair and reasonable” costs will be made on the basis of the cost per student per course or per term. However, in some instances cost data may be presented to justify a cost per hour of instruction where charges are made on the basis of hourly attendance or credit. In either event, the analysis of costs to determine whether or not they are “fair and reasonable” will follow the same pattern, the only difference being that the final dividing factor will be the number of students in one case and the number of student hours in the other case.
*354 In order to make the determination of “fair and reasonable” costs in the light of the. formulae presented herein, it is necessary that the institution present to the Veterans Administration, in certified form,, detailed financial statements, containing the following basic data:
“1. Cost data on the items of expense which will be used in the determination.
2. The basis on which teaching salaries and other expenses have been allocated to the courses involved and and the percentages and amounts of allocation.”
INSTRUCTIONS EOE THE PREPARATION OF COST STATEMENTS
3. The number of students enrolled and the number of clock hours or credit hours during the period covered by the cost data.
The information presented should be the most recent actual cost experience of the institution for the specific courses involved but in the case of new courses estimated costs may be submitted. Where there is more than one course, a cost statement must he submitted for each course, showing the basis and amount of allocation of expense for each course. Unless prior authorization is received from the Regional Office, the cost information will cover a minimum period of one year. Institutions are cautioned that no data presented to substantiate “fair and reasonable” costs can be considered which:
1. Is not in certified form, and
2. Does not explain fully the basis used in making allocations of costs to the various courses.
The individual items of expense which are to be allowed to be used in the determination of “fair and reasonable” cost are explained in the following paragraphs:
‡ ^5 Ht ❖
GENERAL INSTRUCTIONS
B. Enrollments (Schedule 11)
An enrollment figure arrived at by dividing the gross income for the period covered by the cost statement by the tuition per student is not acceptable. Enrollments must be actual enrollment figures of student attendance and student hours taken from the attendance records of the institution. All enrollment figures as well as other items submitted in cost statements are subject to audit by the Veterans Administration.
*355 Attached forms should be followed in presenting cost data for determination of “fair and reasonable” tuition* Full responsibility rests with the facility to present complete and detailed information to permit a determination by the Veterans Administration that the allocations: of the various elements of cost have been made on a. sound and logical basis, and to furnish any additional information which may be required to achieve that purpose. (Underlining in original.)
$ ‡ $
8. The procedure established by the Veterans Administration for the determination of fair and reasonable tuition rates under Change 4 was substantially as follows:
When a cost data statement was received from a school, it was referred to a contract officer in the Regional Office who. made an analysis of the various items of claimed costs to. determine whether they were reasonable expenses in the light of the overall operations and the standards set by the type of' school involved. This was to avoid financing inefficient operation or paying for expenditures not essential to the-maintenance of standards of instruction approved by the-State Education Authority. Any proposed adjustments in-the cost data made by the Regional contract officer were advisory in nature since they were subject to review by the Area. Branch Office of the Veterans Administration where the-tuition rate was finally determined. The rate was arrived at by dividing the total of the adjusted costs plus the specified profit allowance by the total number of student hours; taught, including excusable absences, during the period; covered by the cost data. The resultant figure was the tuition rate per student hour.
9. Upon the expiration of the contract ending July 31, 1948, the school, pursuant to the new requirements of Change-4, filed with the Veterans Administration cost data statements to be used as a basis for the execution of a new contract., beginning August 1,1948. The statements purported to set out the school’s cost of operations for the period July 1,194Y,, to May 31,1948, and were certified by the owner of the school as true and in accordance with the books and records of the-institution. The summary sheets for the auto body repair- and the furniture upholstery courses as filed by the school! were as follows:
*356 Reamended Cost of Complete Autohody Repair & RefinisMng Course (.650 Hours) Based on Actual Costs for the Period from July 1, 1947 to May SI, 1948

Schedule Item No, Amount

1. Teaching personnel- 1 $55, 055. 70
2. Consumable instructional supplies- 2 28, 637. 87
3. Operation and maintenance of plant- 3 10,240. 28
4. Taxes and insurance_ 4 3, 047. 01
96,980. 86 5. Subtotal_
12,531.85 6. Administrative allowance (requested) — W
1, 783.22 7. Depreciation_ ®
7,260. 73 8. Rent_ t-
1,958.76 9. Advertising-CO
10. Total costs-120, 515. 42
11. Income from sources other than tuition.. 2,212. 84
12. Net costs-118,302. 58
13. Profit_ 10 15, 330. 00
14.Total amount-133, 632. 58

Reamended Cost of Furniture Upholstery Course (975 Hours) Based on Actual Costs for the period from August 4, 1941 to May 81, 1948

Schedule Item No. Amount

1. Teaching personnel_ 1 $23,680.15
2. Consumable instructional supplies_ 2 19,482.18
3. Operation and maintenance of plant- 3 3, 734.89
4. Taxes and insurance_ 4 962.21
5. Subtotal. 47, 859.43
6. Administrative allowance (requested)_ 3,957.42 W
7. Depreciation___ 1, 640. 82 CO
8. Rent_ 3, 983. 27 t-
9. Advertising-618. 55 00
10. Total cost_ 58, 059.49
11. Income from sources other than tuition_ 9 698. 79
12. Net costs_ 57,360. 70
13. Profit- 10 4, 914.00
14. Total amount_:_ 62,274. 70
15. Enrollment_ 11 63.0
16. Computed tuition_ 988.49
17. School’s proposed tuition per student_ 1,000. 00
*357 . 10. Attached to the summary sheets were detailed analyses of each of the categories listed, following the suggested forms which had been sent to the school by the Veterans Administration along with the instructions as to how to execute these forms. Schedules 11 and 11A for the auto body course were set out as follows:
(Schedule 11)

Description of Allocation Percentage for the Period from July 1, 1947, to May 31, 1948

Student hours of instruction_ 199, 261
Number of hours — This course_ 650
Student enrollment (199,261^-650)_ 306.6
Student hours of instruction:

Hours Percent

This course_ 199,261 76
Other courses_ 61,445 24
Total_ 260,706 100
(Schedule 11A)

Analysis of Enrollment For the Period from July 1, 1947 to May 31, 1948

PAID student HOURS OE ATTENDANCE
Month Veterans Nonveterans Totai
July, 1947-. 9,118 287 9,405
August, 1947. 18,633 596 19,229
September, 1947. 20,408 634 21,042
October, 1947..— 22,070 128 22,198
November, 1947.. 14,428 198 14,626
December, 1947— 21,138 741 21,879
January, 1948— 16,997 279 17,276
February, 1948_ 18,784 106 18,890
March, 1948_ 10,146 494 10,640
April, 1948. 22,361 155 22,516
May, 1948_ 21,405 155 21,560
Total.. 195,488 3,773 199,261
Student hours of instruction:

Hours Percent

This course_ 199, 261 Oi
Other courses_ 61, 445 to
Total_ 260, 706 100
*358 Schedules 11 and 11A for the furniture upholstery course were set out as follows:
(Schedule 11)

’Description of Allocation Percentage For the Period from July 1, 1947 to May 31, 1948

Student hours of instruction_61, 445
Number of hours — this course_ 975
Student enrollment (61,445 -s- 975)_ 63. 0
Student hours of instruction: Hours Percent
This course_ 61, 445 24
Other courses_ 199, 261 76
Total.__ 260,706 100
(Schedule 11 A)

Analysis of Enrollment For the Period from August 4t 1947 to May 31, 1948

PAID student HOURS OP ATTENDANCE
Month Veterans Nonveterans Total
1947_ 4,696 0 4,596
44
1947--— 125
November, 1947.. 6,653 94 6,747
1947— 6,585 125 6,710
1948.... 75
February, 1948_ 4,459 100 4,559
1948. 2,991 112 3,103
April, 1948. 9,227 150 9,377
May, 1948_ 6,898 150 7,048
Total.. 60,470 976 61,445
Student hours of instruction: Hours Percent
This course___ 61,445 24
Other courses_ 199, 261 76
Total. 260,706 100
11. Following a study of the school’s claimed costs, adjustments were approved by the branch office of the Veterans Administration including certain reallocations between teaching and administrative costs in the auto body course and certain deductions made in the claimed teaching, consumable supplies, and maintenance costs in the furniture upholstery course as deemed necessary to conform with the *359 standards of that type of course and the character of the instruction as reported by the school. The costs for the two courses as approved by the Veterans Administration -were as follows:

Complete Autobody and, Repair Courses

Teaching personnel_$52,522.50
Consumable instructional supplies- 28,637. 87
Operation and maintenance_ 10,240.28
Taxes and insurance_ 3,047. 01
Subtotal_ 94, 447. 66
Administrative allowance- 11, 796.03
Depreciation_ 1, 783.22
Bent_ 7,260. 83
Advertising- 672.46
Total costs_ 115,960.10
Other income_ 2,112. 84
Net costs_ 113,847.26
Profit- 15,330. 00
Total amount_ 129,177.26

Furniture Upholstery Course

Teaching personnel_$15, 848. 08
Consumable instructional supplies_ 15,306.00
Operation and maintenance_'_ 3,261. 54
Taxes and insurance_ 962.21
Subtotal_ 35,377.83
Administrative allowance_ 5, 057.42
Depreciation_ 1, 640. 82
Bent- 2,698. 56
Advertising- 618. 55
Total costs- 45,393.18
Income from other sources_ 3, 032. 91
Net costs- 42,360.27
Profit- 4,914. 00
Total amount- 47,274.27
The allowable costs of $129,177.26 for the auto body course were divided by the student hours of instruction, 199,261, as *360 reported by the school and relied on by the Veterans Administration, resulting in an hourly tuition rate of $.648. Similarly, the allowed costs for the furniture upholstery course of $47,274.27 were divided by the student hours of instruction of 61,445 hours, as reported by the school and relied on by the Veterans Administration, resulting in an hourly tuition rate of $.769. Tuition rates of $.64 per hour for the auto body repair course and $.769 per hour for the furniture upholstery course were offered to the school and accepted. These rates were embodied in Contracts V3006V-H4 and V3006V-139 covering the period August 1, 1948 to July 31, 1949 for the training of Public Law 346 and Public Law 16 veterans, respectively.
12. On August 24, 1949, Public Law 266, 81st Congress, was enacted, 63 Stat. 657, 38 U. S. C. A., chapter 12, which provided that where one or more contracts providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition. This statute effected a “freezing” of the rates embodied in Contracts V3006V-114 and V3006V-139 and eliminated the requirement for submission of any further cost data. Contracts V3006V-522 and V3006V-847 covering the period August 1, 1949 to July 31,1950, were subsequently executed by the parties continuing the training of veterans at the same rates of the previous contract. These frozen rates were paid to the school until August 1,1951, when payments were interrupted as a result of an audit of the school’s records by the General Accounting Office.
13. In the early part of 1951 plaintiffs started two related courses in welding and slip cover and drapery. Cost data were submitted in both courses. The Veterans Administration declined to accept the rates as shown by plaintiffs’ cost statements and determined the welding course to be similar to the auto body course and gave it the same rate. The slip cover and drapery course the Veterans Administration determined to be similar to the furniture upholstery course and gave to it the same rate.
14. During 1950 and 1951 the General Accounting Office undertook a survey of the education program for veterans as *361 administered by the Veterans Administration in the New York area, in the course of which the records of a large number of schools were audited. In the early part of 1951 the Roberts School was selected as a representative institution for audit, without any suspicion that it had been guilty of any irregularities. The audit disclosed that the enrollment figures submitted by the school in its cost data for the period July 1,1947 to May 31,1948, and used as a divisor for the determination of the tuition rates, was not correct, that the student hours of attendance for that period in the auto body course were 277,664 hours rather than 199,261 hours as reported by the school, and the student hours of attendance for the furniture upholstery course were 119,228 hours rather than 61,445 hours as reported by the school. Upon being advised by the General Accounting Office of the discrepancies, the Veterans Administration immediately suspended payments to the school and took steps to recompute the tuition rates in Contracts V3006V-114 and V3006V-139 and which had become frozen in subsequent contracts, on the basis of the new figures in order to recoup the overpayments which had been made.
15. The cost data statements involved in this action had been prepared on behalf of the school by Henry J. Reicher, a certified public accountant. Reicher was a trustee of the Baird Fund which had purchased the stock of the school from Edith and Louis Roberts and later resold it to them. He is one of the co-plaintiffs in the present action. Mr. Reicher testified that although he obtained various items of cost in the statements from the books of the school, the figures for the hours of student attendance for use as the divisor were obtained from those vouchers of the school which had at that time been paid by the Veterans Administration. The divisor figure thus represented only those hours taught during the cost data period for which the school had billed the Veterans Administration and had actually received payment at the time the cost statements were submited. It did not include those hours taught for which no billing had yet been made or for which payment had not yet been received by the school. Reicher explained that he used the Veterans Administration cost data forms in which there appears in Schedule *362 11A under tlie beading “Analysis of Enrollment”, a subheading designated “Paid Student Hours of Attendance.” The purpose of this heading was to alert the school to claim all hours of attendance for which it was entitled to be paid, including permissible absences. The Veterans Administration had a 5 percent permissible absence policy. The contracts in effect during the cost data period contained the following clause:
Payment made for a veteran regularly enrolled is for a course of instruction, and no deduction shall be made from the tuition chargeable on account of reasonable absences. Absences excused by the appropriate school authority mot to exceed five (5%) per cent of the total number of hours of instruction as set forth herein shall be permitted without reduction in the total tuition charge * * *.
For the purpose of determining whether permissible absences have been exceeded, each voucher shall state number of hours actually attended by veteran during period for which voucher is submitted.
“Paid hours of attendance” or “credit hours” was the conventional way of describing hours of attendance plus hours of permissible absence for all of which the school was entitled to be paid. Both schedules 11 and 11A total the figures under the heading “Student Hours of Instruction.” The instructions accompanying the forms define the divisor as constituting total hours of attendance and specifically provide that calculation of a tuition rate based on the school’s income from the Veterans Administration is not acceptable. They listed three required categories of basic cost data, the third of which was “the number of students enrolled and the number of clock hours or credit hours during the period covered by the cost data.” With specific reference to Schedule 11 of the form, under the heading “Enrollments”, the instructions read:
An enrollment figure arrived at by dividing the gross income for the period covered by the cost statement by the tuition per student is not acceptable. Enrollment must be actual enrolbnent figures of student attendance and student hours taken from the attendance records of the institution. (The underlining is in the original.)
*363 Reicher testified that he did not have the instructions, merely the forms. The Regional Office of the Veterans Administration mailed a copy of the instructions, together with the forms, to the school on June 11,1948, about a month before the cost statements were filed. The then Chief of the Training Facilities Section of the Regional Office testified that the instructions and forms were always a single unit and that they were on his desk and frequently consulted while he and Mr. Reicher were discussing the proposed tuition rate. It would be difficult, if not impossible, to properly fill out the forms without using the accompanying instructions as a guide.
16. The Regulation, Change 4, provides that the determination of fair and reasonable compensation “will require the submission by the educational or training institution of detailed, certified financial statements showing the most recent actual cost experience of the institution for the specific courses involved including cost data on the items of expense which will be used for the determination of fair and reasonable compensation * * * and the number of students enrolled and the number of clock hours or credit hours during the period covered by the cost data.” It provides further that “when the manager has completed his analysis of the cost data, he will determine on the basis of the total number of all students trained and the cost of the items listed herein, after reflecting known changes in costs, whether the customary charges of the educational or training institution are fair and reasonable”. The instructions for completing the cost data forms read:
In general, the presentation and determination of “fair and reasonable” costs will be made on the basis of the cost per student per course or per term.
• Mr. Reicher admitted that he knew that the purpose of the cost data was to form a basis for the determination of a tuition rate representing the cost of operation of the school during the cost data period and that the method used to determine the tuition rate per hour was to divide the school’s costs by the number of instruction hours.
If the school were permitted to use as the divisor only those student hours represented by the paid vouchers, it could ob *364 tain virtually any rate it pleased by the simple device of withholding vouchers during the latter months of a contract.
With respect to the forms used as a guide for the preparation of cost data, an official of the Veterans Administration Regional Office in New York testified that although the forms were in use in the New York region during the entire veterans’ education program, the plaintiff school was, to his knowledge, the only school which submitted as its divisor only those hours represented by its paid vouchers. A cost auditor of the General Acounting Office testified that his office made over a hundred audits of trade schools in the New York area and found that only the plaintiff school had submitted hours of attendance from its paid vouchers rather than the figures showing total student attendance.
17. The findings of the General Accounting Office were referred to the Central Office of the Veterans Administration in Washington where the original cost data was reevaluated in the light of the audited costs as determined by the General Acounting Office and the tuition rates recomputed on the basis of the new information with respect to the school’s actual enrollment during the cost data period.
The major adjustments made by the Central Office were in three categories:
(a) In its original cost data statements the school showed that 76 percent of its enrollment was in the auto body course and 24 percent in the furniture upholstery course. It therefore made allocations on these percentages of its operation and maintenance costs, taxes, administrative expenses, rent, advertising, and miscellaneous income. The audit of the General Accounting Office disclosed that the ratio was actually 70 percent and 80 percent and adjustments were made accordingly.
(b) The school claimed in its original cost statements a profit allowance based upon 10 percent of a theoretical gross income from tuition derived from first dividing the hours of each course into the total hours reported and multiplying the resulting average enrollment by the claimed customary charges. Since the gross income was based upon the inaccurate enrollment figures submitted by the school, the General Accounting Office determined the actual income from each *365 course and allowed 10 percent thereof as profit. This determination was accepted by the Veterans Administration Central Office. The result was an increase in the profit allowance for each of the courses.
(c) With respect to the furniture upholstery course, the school’s claimed costs for teaching and consumable supplies had been substantially reduced by the branch office on the ground that the amounts claimed were not justified by the size of the school’s operations and the teacher-student ratio was higher than the standard prevailing in that type of school. With the information, however, that the student hours were actually about twice that previously reported by the school, the amounts claimed in the cost statement now appeared in a more favorable light. Central Office accordingly restored most of the amount claimed for teaching and all of the claimed expenses for consumable supplies.
The following table shows the costs as originally claimed by the school in its cost data statements and as adjusted by Veterans Administration Central Office in accordance with the audit of the school’s records by the General Accounting Office:
Auto Body Repair Course Furniture Upholstery Course
Claimed by school Allowed by central office Claimed by school Allowed by central office
Teaching personnel_ $55,055.70 $53,305.60 $23,680.15 $23,220.25
Consumable supplies_ 28,637.87 28,637.87 19,482.18 19,482.18
Operation and maintenance.. 10,240.28 10,240.28 3,734.89 3,261.54
Taxes and insurance.. 3,047.01 2,806.45 962.21 1,202.77
Subtotal.... 96,980.86 94,990.20 47,859.43 47,166.74
Administrative expense.. 12,531.85 10,435.96 3,957.42 4,472.55
Depreciation_ 1,783.22 1,783.22 1,640.82 1,640.82
Rent____ 7,260.73 7,260.73 3,983.27 3,983.27
Advertising_ 1,958.76 619.37 618.55 265.44
Total costs_ 120,515.42 115,089.48 58,059.49 57,528.82
Less: Other income.. 2,212.84 3,672.03 698.79 1,573.72
Net costs. 118,302.58 111,417.45 57,360.70 55,955.10
Profit_ 15,330.00 18,250.88 4,914.00 8,703.63
Total. 133,632.58 129,668.33 62,274.70 64,658.73
The new total of claimed costs for the auto body repair course as allowed by Central Office in the sum of $129,668.88 was divided by the enrollment figure determined by the General Accounting Office audit of 277,664 hours to yield an *366 hourly tuition rate of $.467. Similarly, the new figure of claimed costs for the furniture upholstery course of $64,-658.73 was divided by the enrollment figure determined by the General Accounting Office audit of 119,228 hours to yield an hourly tuition rate of $.542. Plaintiff does not admit that the enrollment figures which it reported in its cost statements were inaccurate; however, plaintiff has presented no adequate evidence showing that the adjustments made by Central Office or the redetermination of the tuition rates were improper, unreasonable, or unfair.
15. Under the redetermined rate, the resulting overpayment of tuition to the school for the period is $681,815.80 representing $429,512.78 for the auto body repair and refinishing course and $252,303.02 for the furniture upholstering course. Unpaid vouchers have been withheld by the Government in the gross amount of $656,123.01 which, after certain suspensions of $50,830.97 and a reduction of tuition in the amount of $96.87 to conform to the redetermined rate, equal the sum of $605,195.17. Additional vouchers covering billings for tuition for training by the school under Public Law 550 have been withheld from payment in the net amount of $4,726.00, after suspensions. The total net amount of all unpaid vouchers withheld by the Government is $609,921.17. Under the redetermined hourly rates for tuition of $.467 for the auto body repair and refinishing course and $.542 for the furniture upholstering course, the balance due the United States in addition to the net amounts of the withheld unpaid vouchers is $71,894.63.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed. The court further concludes that defendant is entitled to recover on its counterclaim the sum of $681,815.80, subject to plaintiffs’ right of offset in the amount of $609,921.17, and it is therefore adjudged and ordered that defendant recover of and from plaintiffs on its counterclaim the sum of seventy-one thousand eight hundred ninety-four dollars and sixty-three cents ($71,894.63).

 Plaintiffs’ school was originally established in 1947 as a corporation for-profit under the laws of the State of New York and was then known as. Roberts’ Technical Trade School, Inc. On or about October 20, 1948, all of the stock then owned by Edith Roberts and Louis Roberts was sold to the-Baird Fund, an unincorporated charitable trust. The school was operated! by the Baird Fund until December 31, 1948, at which time the corporation was liquidated and the school was operated by the Baird Fund, d. b. a. Technical; and Trade Schools, until June 30, 1951. On or about this latter date the-school was sold to the plaintiffs, Edith Roberts and Louis Roberts, who operated the school as a partnership under the name of Roberts’ Technical Trade-Schools. This partnership was expanded on or about November 1, 1951 to, include Richard Roberts. The three partners together with David G. Baird, and Harry J. Reicher, as Trustees of the Baird Fund, appear as the plaintiffs, in this suit.