Opinion

per curiam,:

This case was referred by the court, pursuant to Rule 45 (a), to Mastín Gr. White, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed December 19,1958. When the more than 15 days provided by Rule 46 (a) had elapsed after the filing of this report, and neither party had given notice in writing of an intention to except to the recommendations and findings of the trial commissioner, the defendant filed a motion for judgment in accordance with the commissioner’s report. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case. Plaintiff’s petition will be dismissed, and judgment will be entered for defendant on its counterclaims against plaintiff in the sum of $483,205.63.
It is so ordered.
OPINION OP THE COMMISSIONER
The petition in this case was filed on December 5, 1955. In the petition, the plaintiff, a private trade school, asked for a judgment against the defendant in the alternative amounts of $239,772.82 or $92,209.92 or $30,174.50 because of services allegedly performed by the plaintiff in the training *346 of World War II veterans pursuant to the provisions of Part VIII of Veterans Regulation No. 1 (a), as amended.[1] The defendant thereafter filed an answer and counterclaims which, as amended, denied any liability to the plaintiff and sought a judgment against the plaintiff in the aggregate amount of $554,334.90.
In order to inaugurate the customary pretrial proceedings, the commissioner on October 1, 1956 issued under Rule 28 (b) (1) a directive requiring the plaintiff to submit certain data to counsel for the defendant on or before November 5, 1956. The plaintiff failed to comply with this directive.
Following a 30-day advance notice to the parties, a trial was held on December 5, 1957. No one representing the plaintiff appeared at the trial, and no evidence was offered on behalf of the plaintiff. The defendant was represented at the trial by counsel, and evidence was offered by the defendant in support of its counterclaims against the plaintiff.
After the trial, the plaintiff did not submit any requested findings of fact, or interpose any objections to the defendant’s requested findings.
The plaintiff was organized for the specific purpose of training World War II veterans, and it began its program of training veterans in automobile mechanics on or about September 18, 1947. One of the defendant’s counterclaims is based upon alleged overpayments by the Veterans Administration to the plaintiff of tuition on behalf of veterans in regular attendance at the plaintiff’s school during the period which began on July 1,1949 and continued until the plaintiff ceased active operations on October 31, 1952.
In order to continue the program of training veterans during the fiscal year July 1, 1949-June 30, 1950, it was necessary for the plaintiff, in accordance with 38 CFR 36.288 (b) *347 (2) ,[2] to enter into a contract with, the Veterans Administration. It was provided in the regulation just mentioned that such a contract should incorporate a tuition rate determined by the Veterans Administration “to be fair and reasonable” upon the basis of data submitted by the plaintiff relative to its actual costs during the preceding year.[3]
In preparation for the making of a contract to cover the fiscal year July 1,1949-June 30, 1950, the plaintiff submitted to the Veterans Administration on or about September 12, 1949 a statement of its costs during the year July 1, 1948-June 30, 1949. The president and treasurer of the plaintiff certified under oath that the statement was “a true, correct, and complete statement of income and expense.” Thereafter, on the basis of the cost data submitted by the plaintiff, the Veterans Administration calculated the monthly cost per student to the plaintiff of training its students, added one-ninth for profit, and thus determined that a tuition rate of $46.48 per month per student would be a fair and reasonable rate to be charged by the plaintiff for the training of veterans during the year July 1, 1949-June 30, 1950. This tuition rate included the cost, as shown on the plaintiff’s cost, statement, of furnishing tools and books to the plaintiff’s students.
The Veterans Administration and the plaintiff then entered into a contract (No. V3020V-420) retroactively as of July 1,1949 to cover the period which began on that date and ended on June 30, 1950. This contract fixed the tuition rate to be charged by the plaintiff as $46.48 per student per month, in accordance with the determination previously made by the Veterans Administration.
For the fiscal year which began on July 1,1950 and ended on June 30,1951, the plaintiff and the Veterans Administration entered into a new contract (No. V3020V-627). This *348 contract continued the tuition rate of $46.48 per student per month which had been determined by the Veterans Administration, on the basis of cost data submitted by the plaintiff, to be fair and reasonable, and which had been incorporated in contract No. V3020V-420. This tuition rate had become “frozen” prior to July 1, 1950 by virtue of the provision in the Independent Offices Appropriation Act, 1950, approved August 24, 1949 (63 Stat. 631, 653), to the effect that:
* * * In any case in which one or more contracts [between the Veterans Administration and an educational or training institution] providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition * * *.
No further contract was entered into between the plaintiff and the Veterans Administration after the expiration of contract No. V3020V-627. Notwithstanding the expiration of that contract, the plaintiff continued to furnish training to World War II veterans. In the absence of a contract, the tuition rate chargeable by the plaintiff (but for the matters referred to below) was the “frozen” rate previously mentioned.
Sometime after November 6, 1951, the Veterans Administration conducted a thorough investigation and audit of the plaintiff’s operations and books because of numerous complaints which the Veterans Administration had received from students attending the plaintiff’s school. As a result of the investigation, it was discovered (among other things) that many of the cost data which the plaintiff had submitted to the Veterans Administration on or about September 12,1949, and which formed the basis for the tuition rate of $46.48 per month per student prescribed in contracts V3020V-420 and V3020V-627, were false and inflated. On the basis of the plaintiff’s actual costs during the year July 1,1948-June 30, 1949, the proper tuition rate for the period which began on July 1, 1949 (with an appropriate allowance for profit) should have been $32,987 per student per month (including the cost of furnishing tools and books to students). Because of the false and inflated cost data which the plaintiff submitted to the Veterans Administration, and which formed the *349 basis for the tuition rate determined by the Veterans Administration to be fair and reasonable, the plaintiff collected from the Veterans Administration as tuition on behalf of veterans in regular attendance at the plaintiff’s school on and after July 1, 1949 $174,678.69 more than the plaintiff was entitled to charge at the proper tuition rate.
At the time involved in this case, the plaintiff was only entitled to receive, and the Veterans Administration was only warranted in paying, a “fair and reasonable” tuition rate based upon the plaintiff’s actual costs during the year July 1, 1948-June 30, 1949, plus a proper allowance for profit. When the Veterans Administration, after having determined the amount of what appeared to be a fair and reasonable tuition rate upon the basis of cost data submitted by the plaintiff, and after having incorporated such tuition rate in successive contracts with the plaintiff, discovered that the cost data submitted by the plaintiff were false and inflated, the Veterans Administration had the authority and the duty to redetermine the tuition rate, to make the redetermined rate effective retroactively, and to take appropriate action looking toward the recoupment or recovery of the overpayments previously made to the plaintiff. Edith Roberts et al. v. United States, 141 C. Cls. 340; see Carroll Vocational Institute v. United States, 211 F. 2d 539, 541 (C.A. 5, 1954).
In this situation, since the overpayments mentioned above were made to and received by the plaintiff because of misrepresentations which the plaintiff had made to the Veterans Administration, the plaintiff “is obliged by natural justice and equity to refund” such moneys to the Government, and, therefore, a promise to repay can be implied. Herman Shwarz v. United States, 35 C. Cls. 303, 310 (1900). The Court of Claims undoubtedly has jurisdiction to grant a judgment to the United States on its counterclaim for the amount of these overpayments.
The evidence also shows that the plaintiff, pursuant to vouchers and certifications submitted by it, collected from the Veterans Administration a total of $17,232.56 as tuition for purported students with respect to periods for which no tuition was properly chargeable, since the persons involved either were not enrolled or were not in regular attendance at *350 the plaintiff’s school during the particular periods. Similarly, the evidence shows that the plaintiff collected from the Veterans Administration a total of $1,593 for tools and books which it claimed in vouchers and certifications to have furnished to students, but which it actually did not furnish to students. With respect to the items mentioned in this paragraph, it seems to be clear that the Government is entitled to recover on its counterclaims by virtue of the plaintiff’s implied promise to repay these amounts which it improperly collected on the basis of its false representations to the Veterans Administration.
The defendant has also asserted a counterclaim in connection with certain subsistence payments that were made by the Veterans Administration to persons carried on the plaintiff’s roll of students. It appears that the Veterans Administration, in reliance on the plaintiff’s attendance records and reports, which were inaccurate, paid to persons carried on the plaintiff’s roll of students subsistence allowances under paragraph 6 of Part VIII of Veterans Regulation No. 1 (a), as amended,[4] in an amount aggregating $539.78 with respect to periods during which such persons were not entitled to receive subsistence allowances because of excessive absences. The plaintiff wias required to, and did, make such attendance records and reports available to the Veterans Administration. Since the plaintiff knew that the Veterans Administration would rely upon them in paying subsistence allowances to persons carried on the plaintiff’s roll of students, and knew, or should have known, that such attendance records and reports were inaccurate, it seems that the plaintiff is liable to the defendant for the financial loss sustained by the defendant as a result of the plaintiff’s deceit. See Seaboard Surety Company v. Permacrete Construction Corporation, 221 F. 2d 366, 375 (C. A. 3, 1955).
Of course, the counterclaim mentioned in the preceding paragraph is based on a tort; and, in so far as claims against the United States are concerned, “cases * * * sounding in *351 tort” are excluded from the jurisdiction of tbe Court of Claims (28 U. S. C. 1491 (5)). However, with regard to counterclaims by the United States against persons instituting suits against the Government in the Court of Claims, it is provided in 28 U. S. C. 1503 that:
The Court of Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court. [Emphasis supplied.]
In connection with this broad grant of jurisdiction, the Supreme Court has said that:
* * * the set-off and counterclaim jurisdiction of the Court of Claims, was intended to permit the Government to have adjudicated in one suit all controversies between it and those granted permission to sue it * * * . [Cherry Cotton Mills v. United States, 327 U. S. 536, 539 (1946). Emphasis supplied.]
Hence, under 28 U. S. C. 1503, the Court of Claims can grant a judgment to the United States on a counterclaim based upon a plaintiff’s tortious conduct. Erie Basin Metal Products, Inc., et al. v. United States, 123 C. Cls. 433, 436-437 (1952).
The United States has recouped $71,128.27 by withholding payments actually earned by the plaintiff in the aggregate amount stated. This has reduced the amount of the plaintiff’s liability to the United States on the overpayments, etc., discussed above to a net total of $122,915.76 .
The evidence supporting another counterclaim of the defendant shows that the plaintiff is indebted to the defendant for unpaid income taxes, Federal unemployment taxes, and withholding taxes (FICA), which the plaintiff should have paid but did not pay, in amounts which (including penalties and interest) totaled $360,289.87 as of January 4, 1957.
It appears, in the absence of proof suporting the plaintiff’s claim, and in the absence of evidence or objections by the plaintiff to controvert the defendant’s counterclaims, that the plaintiff’s petition should be dismissed and that the defendant is entitled to a judgment against the plaintiff on the defendant’s counterclaims in the total amount of $483,-205.63.
*352 FINDINGS OFFAOT
1» (a) After the filing of this suit, the commissioner on October 1,1956 issued to the plaintiff a directive under Eule 28 (b) (1) requiring the plaintiff to furnish to counsel for the defendant on or before November 5,1956:
(1) a list accurately describing the documents which the plaintiff relies upon and which the plaintiff expects to offer in evidence, together with photostatic copies of such documents unless the originals or copies thereof are already in the possession of the defendant; and
(2) a statement of the relevant matters of fact as to which the plaintiff believes that there is no substantial controversy between the parties.
(b) The plaintiff failed to comply with the directive referred to in paragraph (a) of this finding.
2. (a) On October 14,1957, the commissioner transmitted to the plaintiff a communication stating as follows:
You are afforded an opportunity to show cause in writing why the commissioner should not, pursuant to Eule 28 (e) (3) of the Eules of the United States Court of Claims, refuse to allow the plaintiff to support the claims set forth in its petition because of the plaintiff’s failure to comply with the directive that was issued by the commissioner on October 1, 1956 under Eule 28 (b) (1).
Any response to this communication shall be submitted to the commissioner on or before November 1, 1957.
(b) No response was made by the plaintiff to the communication quoted in paragraph (a) of this finding.
3. (a) On November 4, 1957, the commissioner addressed to the plaintiff and to the defendant a joint communication advising them that the trial of this case would be held in the Court of Claims Building, Washington, D. C., beginning at 10 a. m. on December 5,1957.
(b) The trial was held in the Court of Claims Building, Washington, D. C., beginning at 10 a. m. on December 5,1957. No one representing the plaintiff appeared at the trial, and no evidence was offered on behalf of the plaintiff. The defendant was represented at the trial by counsel, and both *353 oral testimony and documentary evidence were offered on-behalf of the defendant.
4. The plaintiff, a private trade school, was incorporated under the laws of the State of Tennessee in 1947 for the purpose of training veterans of World War II pursuant to the provisions of Part VIII of Veterans Regulation No. 1 (a), as amended. At all times material to this litigation,, the plaintiff maintained its principal place of business in Memphis, Tennessee.
5. On September 18, 1947, after having been approved by the Department of Education of the State of Tennessee as a school authorized to train veterans, the plaintiff began to enroll veterans for training in a course relating to automobile mechanics. The plaintiff thereafter furnished such training until October 31, 1952, when its approval was revoked by the State agency. Throughout the period of the plaintiff’s active operations, most (and perhaps all) of the plaintiff’s students were veterans of World War II who were being trained pursuant to the provisions of Part VTII of Veterans Regulation No. 1 (a), as amended.
6. In the training of veterans up to and including June 30, 1948, the plaintiff’s operations were not governed by any contract between the plaintiff and the defendant, but such operations were subject generally to (among other provisions) Part VIII of Veterans Regulation No. 1 (a), as amended. The matter of the compensation to be paid to the plaintiff by the Veterans Administration (representing the defendant) during this period was subject to the provisions of paragraph 5 of Part VIII, as amended.[5] At the time, this paragraph declared in part as follows:
The Administrator shall pay to the educational or training institution * * * for each person enrolled in full time or part time course of education or training, the customary cost of tuition, and such laboratory, library, health, infirmary, and other similar fees as are customarily charged, and may pay for books, supplies, equipment, and other necessary expenses, * * * as are generally required for the successful pursuit and com *354 pletion of tbe course by other students in the institution: Provided, That in no event shall such payments, with respect to any person, exceed $500 for an ordinary school year * * * .
7. (a) The plaintiff and the Veterans Administration (representing the defendant) entered into a contract (No. V3020V-100) on August 13, 1948. This contract related to the furnishing by the plaintiff of training to veterans of World War II pursuant to Part VIII of Veterans Regulation No. 1 (a), as amended, and it covered the period which began on July 1,1948 and ended on June 30,1949.
(b) Paragraph (c) of Article 1 of contract V3020V-100 provided as follows:
The Contractor will furnish outright to the veteran, as needed, such books, supplies, and equipment as are necessary for the satisfactory pursuit and completion of the courses * * *. It is understood and agreed that the books, supplies, and equipment to be so furnished will consist of those items required, but in no instance greater in variety, quality, or amount than are required by the Contractor to be provided personally by other and all students pursuing the same or similar courses.
(c) Article 3 of contract V3020V-100 provided a follows:
The Contractor shall maintain records of attendance, deportment, and progress of veterans in training under this contract and shall make available such records and furnish such reports to the Veterans Administration at such intervals as may be mutually determined and as may be necessary and required by the Veterans Administration to administer the training of the veteran as required by the law.
(d) Schedule 1 of contract V3020V-100 gave the name of the course to be taught by the plaintiff under the contract as automobile mechanics, the length of the course as 78 weeks or 1,950 hours, and the tuition for the course as $472.62 per student per school year of 39 weeks. The tuition rate included the cost of the tools and books which the plaintiff was obligated to furnish its students in accordance with the contract.
8. In order to continue its program of training World War II veterans during the fiscal year that began on July 1,1949, it was necessary for the plaintiff, in accordance with a regu *355 lation of the Veterans Administration[6] which had become effective during the previous fiscal year, to enter into a further contract with the Veterans Administration. It was provided by the regulation just mentioned that such a contract should incorporate a tuition rate determined by the Veterans Administration “to be fair and reasonable” upon the basis of data submitted by the plaintiff relative to its actual costs during the preceding year.
9. (a) In preparation for the making of a contract to cover the year July 1,1949-June 30, 1950, the plaintiff submitted to the Veterans Administration on or about September 12, 1949 a statement of its costs from July 1, 1948 to June 30, 1949, inclusive. The president and treasurer of the plaintiff certified under oath that the statement was “a true, correct, and complete statement of income and expense.” Thereafter, on the basis of the cost data submitted by the plaintiff, the Veterans Administration calculated the monthly cost per student to the plaintiff of training its students, added one-ninth for profit, and thus determined that a tuition rate of $46.48 per month per student would be a fair and reasonable rate to be charged by the plaintiff for the training of veterans during the year July 1, 1949-June 30, 1950. This tuition rate included an item of $3.45 reflecting the monthly cost, as shown on the plaintiff’s cost statement, of the tools and books which the plaintiff was obligated to furnish to each of its students.
(b) The Veterans Administration and the plaintiff then entered into a contract (No. V3020V-420) retroactively as of July 1,1949 to cover the period which began on that date and ended on June 30,1950.
(c) Schedule 1, which was attached to and made a part of contract V3020V-420, fixed the tuition rate to be charged by the plaintiff as $46.48 per student per calendar month, in accordance with the determination previously made by the Veterans Administration (see paragraph (a) of this finding).
(d) Contract V3020V-420 contained provisions identical with those quoted in paragraphs (b) and (c) of finding 7 from contract V3020V-100.
*356 (e) Schedule 1 also prescribed certain mandatory “Attendance Requirements”, reading in part as follows:
Any student who is absent on three days in any 30-day-period shall be interrupted and dropped from the enrollment of the school under the following conditions:
(a) Students absent with an authorized excuse-sickness, accident, death, etc.) will be interrupted at the close of the third day, but may be classed, progress “satisfactory” and re-entered upon return to school.
(b) Students absent without authorized excuse will be interrupted at the close of the third day for reason of unsatisfactory progress due to excessive absence, and may not be re-entered in school until cleared through the Veterans Administration.
10. (a) For the fiscal year which began on July 1, 1950 and ended on June 30, 1951, the plaintiff and the Veterans: Administration entered into a new contract (No. V3020V-627).
(b) Contract V3020V-627 contained provisions identical with those quoted in paragraphs (b) and (c) of finding 7 from contract V3020V-100.
(c) Contract V3020V-627 contained provisions with respect to attendance that were similar to the provisions quoted in paragraph (e) of finding 9 from contract V3020V-420.
(d) Schedule 1, which was attached to and made a part of contract V3020V-627, continued the tuition rate of $46.48 per student per month which had been determined by the Veterans Administration to be fair and reasonable and which had been incorporated in contract No. V3020V-420 (see paragraphs (a)-(c) of finding 9). This tuition rate had become “frozen” by virtue of the provision in the Independent Offices Appropriation Act, 1950, approved August 24, 1949 (63 Stat. 631, 653), to the effect that:
* * * In any case in which one or more contracts [7] providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition * * *.
*357 11. Sometime during the fiscal year July 1, 1950-June 30, 1951, the plaintiff and the Veterans Administration entered into Supplement No. 2 to contract No. V3020V-420 and Supplement No. 1 to contract No. V3020V-627. Each of these supplements retroactively reduced the tuition rate in the related contract from $46.48 per month to $45.43 per month throughout the entire year covered by the particular contract. The reason for such reduction was the discovery that the plaintiff’s cost statement (see findings 8 and 9 (a) ) contained a mathematical error in connection with the computation of one of the cost items.
12. No further contract was entered into between the plaintiff and the Veterans Administration after the expiration of contract No. V3020V-627. Notwithstanding the expiration of that contract, the plaintiff continued to furnish training to World War II veterans. In the absence of a contract, the tuition rate chargeable by the plaintiff (but for the matters mentioned in subsequent findings) was the “frozen” rate as modified by the parties (see findings 10 (d) and 11).
13. (a) In the fall of 1951, it was discovered that the plaintiff, during the period May-August 1950, had exceeded its enrollment quota or ceiling as established by the Tennessee State Department of Education. The pertinent regulations of the Veterans Administration required that in such a situation the institution involved, after obtaining proper approval with respect to the over-enrollment period, should submit a cost statement covering such period in order that the tuition rate might be renegotiated on the basis of the higher enrollment. The plaintiff failed to submit the required cost statement, notwithstanding the fact that the Veterans Administration on several occasions requested the plaintiff to submit such statement. In the absence of cost data from the plaintiff with respect to the over-enrollment period, the Veterans Administration recomputed the tuition rate on the basis of information available to it at the time. Information concerning a revised tuition rate was furnished by the Veterans Administration to the plaintiff in a letter dated November 6,1951, which stated in part as follows:
Due to the fact that your school has not complied with our various requests which were made as early as Feb *358 ruary 28,1951 for cost data in order that a redetermination of tuition rates could be made beginning with Contract No. V3020V-420 covering the period July 1,. 1949 through June 30,1950, you are hereby notified that it has been administratively determined that the following tuition rates will be applicable for your course in-Automobile Mechanics:
Contract V3020V-420 for the period July $37.84 per calendar 1.1949 through June 30, 1950 month
Contract V3020V-627 for the period July $37.84 per calendar 1.1950 through June 30,1951 month
$681.12 course charge-
(b) The letter of November 6, 1951 also informed the-plaintiff that in the absence of a contract between the plaintiff and the Veterans Administration, such letter and its; attachments would be operative on and after July 1, 1951.. The letter of November 6, 1951, together with its attachments, prescribed for the post-contract period provisions', covering (among other things) the tuition rate, attendance-requirements, maintenance of records, and the furnishing: of books, supplies, and equipment to students. Such provisions were similar to those in contracts Nos. V3020V-420: and V3020V-627, as modified.
(c) The plaintiff did not interpose any objection to-the letter dated November 6, 1951 from the Veterans-Administration.
14. Sometime after November 6, 1951, the Veterans Administration conducted a thorough investigation and audit, of the plaintiff’s operations and books because of numerous, complaints which the Veterans Administration had received from students attending the plaintiff’s school. As a result', of the investigation, it was discovered that:
(a) Many of the cost data which the plaintiff submitted, to the Veterans Administration on or about September 12,. 1949, and which formed the basis for the tuition rate of $46.48 per month per student prescribed in contracts V3020V-420 and V3020V-627, were false and inflated. Exclusive of the data relating to the cost of furnishing tools and books to students, the plaintiff’s cost statement was $56,028.47 higher than the plaintiff’s actual costs had been.
(b) On the basis of the plaintiff’s actual costs during the year July 1, 1948-June 30, 1949, the proper tuition rate *359 (with an appropriate allowance for profit) on and after July 1,1949 should have been $31.47 per student per month, exclusive of the cost of tools and books. Pursuant to vouchers and certifications submitted by the plaintiff with respect to the period which began on July 1, 1949 and ended on October 31, 1952, the Veterans Administration paid to the plaintiff as tuition on behalf of veterans in regular attendance at the plaintiff’s school $140,195.13 more than the plaintiff was entitled to charge as tuition at the proper rate of $31.47 per student per month, exclusive of the cost of tools and books.
(c) The actual cost of the tools and books furnished by the plaintiff to its students amounted to $1.517 per student per month. The plaintiff collected from the Veterans Administration, pursuant to vouchers and certifications submitted by the plaintiff with respect to the furnishing of tools and books to students, $34,483.56 more than it was entitled to collect on the basis of the actual cost of the tools and books which it furnished to its students.
(d) The plaintiff collected from the Veterans Administration a total of $1,593 for tools and books which it claimed in vouchers and certifications to have furnished to students but which it actually did not furnish to students.
(e) The plaintiff collected from the Veterans Administration, pursuant to vouchers and certifications submitted by the plaintiff, a total of $17,232.56 as tuition for purported students with respect to periods for which no tuition was properly chargeable, since the persons involved either were not enrolled or were not in regular attendance at the plaintiff’s school during the particular periods.
(f) The Veterans Administration, in reliance on the plaintiff’s attendance records and reports, which were inaccurate, paid to persons carried on the plaintiff’s roll of students subsistence allowances under paragraph 6 of Part VIII of Veterans Kegulation No. 1 (a), as amended, in an amount aggregating $539.78 with respect to periods during which such persons were not entitled to received subsistence allowances because of excessive absences. The plaintiff was required to, and did, make such attendance records and reports available to the Veterans Administration. It knew that the Veterans *360 Administration would rely upon them in paying subsistence allowances to persons carried on the plaintiff’s roll of students, and knew, or should have known, that such attendance records and reports were inaccurate.
15. After the investigation mentioned in finding 14, the ■defendant recouped $71,128.27 by withholding payments actually earned by the plaintiff in the aggregate amount stated.
16. The plaintiff is indebted to the defendant for unpaid income taxes, Federal unemployment taxes, and withholding taxes (FICA), which the plaintiff should have paid but did mot pay, in amounts which (including penalties and interest) totaled $360,289.87 as of January 4,1957.
17. The defendant is entitled to a judgment in the total amount of $483,205.63 on its counterclaims against the plaintiff.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter -of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.
It is further concluded that the defendant is entitled to recover on its counterclaims, and it is therefore adjudged and ordered that the United States recover of and from Tennessee Mechanical Institute, Inc., the sum of four hundred eighty-three thousand two hundred five dollars and sixty-three cents ($483,205.63).

 Veterans Regulation No. 1 (a) was originally promulgated in Executive Order No. 6156, dated June 6, 1933. In order to provide educational benefits for veterans of World War II, the Congress legislatively expanded Veterans Regulation No. 1 (a) by adding to it (among other provisions) a new Part VIII. This part was added on June 22, 1944 by sec. 400 (b) of Title II of the Servicemen’s Readjustment Act of 1944 (58 Stat. 284, 287-290). Subsequent references will be made to the amendments to Part VIII that are pertinent to this litigation. The current version of Veterans Regulation No. 1 (a), including Part VIII, is set out in Chapter 12A of Title 38, U. S. C. A.

 This regulation -was promulgated in 13 F. R. 2698.

 The validity of this provision was upheld in Metropolitan Training Center v. Gray, 188 F. 2d 28, 29 (D. C. Cir., 1951), notwithstanding the declaration in the governing statutory provision to the effect that “The Administrator [of the Veterans Administration] shall pay to the educational or training institution * * * for each person enrolled in full time or part time course of education or training, the customary cost of tuition * * (Par. 5 of Part VIII, Veterans Regulation No. 1 (a)i, as amended by Bee. 5 (d) of the act of December 28, 1945 (59 Stat. 623, 625) and by sec. 2 of the act of August 6, 1947 (61 Stat. 791).)

 The pertinent amendments were made by see. 2 of the act of August 8, T946 (60 Stat. 934) ; by sec. 3 of the act of August 6, 1947 (61 Stat. 791) ; by sec. 1 of the act of February 14, 1948 (62 Stat. 19); by sec. 1 of the act of May 4, 1948 (62 Stat. 208) ; and by sec. 6 of the Veterans’ Education and Training Amendments of 1950 (64 Stat. 336, 341).

 The amendments to paragraph 5 as of that time had been made by see. 5 (d) of the act of December 28, 1945 (59 Stat. 62.3, 625) and by sec. 2 of the act of August 6, 1947 (61 Stat. 791).

 38 CFR 36.288 (b) (2), as promulgated In 13 F. R. 2698.

 This provision related to a contract or contracts between the Veterans Administration and an institution engaged in the education or training of World War II veterans pursuant to Part VIII of Veterans Regulation No. 1 (a), as amended.